UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------------x
BROTHERHOOD MUTUAL INSURANCE COMPANY,

                           Plaintiff,

             - against -

KURT LUDWIGSEN A/K/A KURT VOGNER,

                           Defendant.
----------------------------------------------------------------------x

**OPINION AND ORDER**

No. 16-CV-6369 (CS)

Appearances:
Aaron M. Schlossberg
The Law Office of Aaron M. Schlossberg, Esq., P.L.L.C.
New York, New York
*Counsel for Plaintiff*

Michael K. Burke
Burke, Miele, Golden & Naughton, LLP
Goshen, New York
*Counsel for Defendant*

Seibel, J.

      Before the Court are the motions for summary judgment of Plaintiff Brotherhood Mutual

Insurance Company, (Doc. 64), and Defendant Kurt Ludwigsen, (Doc. 67). For the following

reasons, both motions are DENIED.

## I.    **BACKGROUND**

      The following facts, which are based on the parties' Local Rule 56.1 statements and

supporting materials, are undisputed unless otherwise noted.[1]

---

[1] Plaintiff, in responding to Defendant's Rule 56.1 Statement of Material Facts, replicated the paragraphs in
Defendant's 56.1 Statement but failed to include the corresponding citations provided by Defendant. (*Compare*
Doc. 68 ("D's 56.1 Stmt."), *with* Doc. 76 ("P's 56.1 Stmt. and Resp.").) The purpose of my Individual Practice
requiring the non-moving party to reproduce the moving party's statement and put its response directly below it is so
that the Court can have the parties' positions in one document. The removal of citations to the record frustrates that
purpose. More disturbing are Plaintiff's counsel's overwrought accusations of misconduct by Defendant's counsel.
(*See* Doc. 70 ("P's Reply") at 9-10; Doc. 83.) I have already admonished Plaintiff's counsel for being too quick to

## A.    The Underlying Actions

Nyack College (the "College") hired Defendant to be the head coach of its softball team (the "Team") for the 2014-2015 academic year.  (Doc. 75 ("D's 56.1 Stmt. and Resp.") ¶ 7.) Between October 2, 2015 and December 8, 2015, six Team members – K. Doe, E. Doe, A. Doe, S. Doe, Y. Doe, and M. Doe, (collectively the "Underlying Plaintiffs") – brought lawsuits against him, the College, and various College administrators and employees (the "Underlying Actions").[2]  On April 14, 2016, having amended their complaints once before, the Underlying Plaintiffs each filed a second amended complaint (the "Underlying Complaints").[3]  The Underlying Complaints allege that Defendant, "acting in his capacity as Head Coach of the Nyack College women's softball team," engaged in a "pattern and practice of outlandish sexual harassment and sexual assault."  (K. Doe SAC ¶ 1; *see id.* ¶ 92 ("[Defendant's] sexual harassment . . . occurred during the course and within the scope of his employment as Head Coach of the Softball Team.").)

The Underlying Complaints allege that Defendant "exert[ed] . . . a tremendous level of control over members of the Softball Team . . . through a pattern and practice of intimidation" by:

---

allege misconduct without a concrete basis.  (Doc. 40 at 14:12-15:13.)  There is a line between zealous advocacy and improper conduct, and crossing, or even approaching, that line is not an effective way to litigate in this Court.

[2] Complaint, *K. Doe v. Ludwigsen*, No. 15-CV-7822 (S.D.N.Y. Oct. 2, 2015), ECF No. 1; Complaint, *E. Doe v. Ludwigsen*, No. 15-CV-7825 (S.D.N.Y. Oct. 2, 2015), ECF No. 1; Complaint, *A. Doe v. Ludwigsen*, No. 15-CV-7827 (S.D.N.Y. Oct. 2, 2015), ECF No. 1; Complaint, *S. Doe v. Ludwigsen*, No. 15-CV-7867 (S.D.N.Y. Oct. 5, 2015), ECF No. 1; Complaint, *Y. Doe v. Ludwigsen*, No. 15-CV-8059 (S.D.N.Y. Oct. 14, 2015), ECF No. 1; Complaint, *M. Doe v. Ludwigsen*, No. 15-CV-9581 (S.D.N.Y. Dec. 8, 2015), ECF No. 1.

[3] Second Amended Complaint, *K. Doe v. Ludwigsen*, No. 15-CV-7822 (S.D.N.Y. Apr. 14, 2016), ECF No. 41 ("K. Doe SAC"); *E. Doe v. Ludwigsen*, No. 15-CV-7825 (S.D.N.Y. Apr. 14, 2016), ECF No. 43 ("E. Doe SAC"); *A. Doe v. Ludwigsen*, No. 15-CV-7827 (S.D.N.Y. Apr. 14, 2016), ECF No. 43 ("A. Doe SAC"); *S. Doe v. Ludwigsen*, No. 15-CV-7867 (S.D.N.Y. Apr. 14, 2016), ECF No. 40 ("S. Doe SAC"); *Y. Doe v. Ludwigsen*, No. 15-CV-8059 (S.D.N.Y. Apr. 14, 2016), ECF No. 41 ("Y. Doe SAC"); *M. Doe v. Ludwigsen*, No. 15-CV-9581 (S.D.N.Y. Apr. 14, 2016), ECF No. 33 ("M. Doe SAC").  The Underlying Complaints are also available at Doc. 72 ("Burke Aff.") at Exs. at 3-8.  Because the complaints are nearly identical, the Court will refer to the K. Doe SAC when describing the allegations contained in all of the SACs.

- threatening Team members at the first practice, telling them that he "could 'make [their] lives a living hell' if they upset him";
- mandating that Team members attend a nightly study hall with other College athletes, but forbidding them from interacting with non-Team members;
- forbidding Team members' parents from attending practices;
- forbidding Team members from speaking to their parents during games;
- forbidding Team members from having in-person or telephonic contact with their family members during a tournament in Arizona (the "Arizona Tournament"); and
- confiscating Team members' cellular phones for a full day during the Arizona Tournament.

(*Id.* ¶ 21(a)-(d).)  Defendant's alleged conduct caused Team members to fear Defendant and perceive him as having immense power over their scholarships, playing time, career ambitions, and personal and professional futures.  (*Id.* ¶ 21.)

The Underlying Complaints also allege that Defendant "perpetuated a sexually-charged atmosphere through multiple inappropriate and offensive actions and/or comments."  (*Id.* ¶ 24.) These actions included:

- proclaiming the phrase "top tits" as the rallying cry for the Team;
- frequently saying, "Zip, thud," while using his arm to mime an erect phallus from his pants, purportedly as a metaphor for the Team's dominance over opponents;
- asking Team members about their sex lives on a regular basis, and demanding graphic details about the frequency and nature of their sexual activities;
- punching Team members in their breasts, which Defendant called "tit punching";
- holding mandatory group meetings with Team members and their boyfriends during which Defendant would inquire in graphic detail about the couples' sex lives;
- arranging for a mandatory alcohol outing under the guise of "team bonding" where the mandatory dress code was cocktail dresses and high heels, and during the outing dancing with several Team members and directing Team members to dance with older, male patrons at a nightclub, (referred to as the "Alcohol Outing");
- renting a five-bedroom house to accommodate the Team, rather than a hotel, for a travel tournament, which required Team members to sleep on couches and the floor while two school administrators shared a bedroom with Defendant; and
- forcing a Team member to sit on his lap during a game, in plain view of two school administrators.

(*Id.* ¶ 24(a)-(h).)  Defendant also offered to help Team members pursue careers in the adult entertainment industry and encouraged them to socialize with a pornographic actress and ask her for advice, and on one occasion, Defendant required all Team members to visit his home for a question-and-answer session with her.  (*Id.* ¶¶ 22-23.)  In addition, Defendant allegedly "made unwanted verbal and/or physical sexual advances toward [each] [Underlying Plaintiff] individually."  (*Id.* ¶ 25.)  Defendant's actions included:

- unwanted touching, grabbing, and slapping of the buttocks;
- whispering vulgar comments;
- placing his face directly against the face of a Team member so that their noses and cheeks touched, then proceeding to have conversations;
- discussing pornographic films;
- bragging about having sex with his wife;
- talking graphically about the sex lives of Team members and his own;
- kissing a Team member on her cheeks and lips without her consent;
- licking ears as a form of "punishment" for unsuccessful performance;
- texting a Team member late at night, inducing her to meet, and during the meeting, pulling and holding her against him, and asking whether she would be motivated to win if he found someone with whom she could have sex; and
- shaking a Team member's breasts and proclaiming, "This is what 'top tits' looks like."

(*Id.* ¶ 25(a)-(l).)[4]  The Underlying Complaints also claim that Keith Davie, the College's athletic director, "turned a blind eye to the sexual harassment until he could no longer claim ignorance of [Defendant's] behavior."  (*Id.* ¶ 28; *see id.* ¶ 14.)  Specifically, Davie:

- approved the use of a college van for the Alcohol Outing and was present as the Team boarded the van for the trip, observing Team members in their cocktail attire;
- observed Defendant force a Team member to sit on his lap during a game at the Arizona Tournament;
- during the Arizona Tournament, observed Defendant force a Team member to sit in his embrace for twenty minutes outside of the Team dugout while Defendant made sexually explicit comments to her;

---

[4] The other SACs allege similar incidents.  (*See* A. Doe SAC ¶ 25; E. Doe SAC ¶ 25; M. Doe SAC ¶ 25; S. Doe SAC ¶ 25; Y. Doe SAC ¶ 25.)  Another Team member alleged that Defendant harassed her because of her sexual orientation.  (*See* M. Doe SAC ¶ 26.)

- during the Arizona Tournament, observed Defendant force a Team member to sit in his embrace by a pool while he made sexually explicit comments to her; and
- while in the bleachers at the Arizona Tournament, observed Defendant approach a Team member from behind, wrap his arms around her, and shake her breasts repeatedly.

(*Id.* ¶ 28(a)-(e).)

As to Defendant, the Underlying Complaints assert claims of intentional infliction of emotional distress, negligent infliction of emotional distress, and battery. (*Id.* ¶¶ 94-120.) Defendants answered the Underlying Complaints, denying the allegations. (*See, e.g.*, *K. Doe v. Ludwigsen*, No. 15-CV-7822, Doc. 56 (S.D.N.Y. June 16, 2016).)

**B.      The Insurance Policy**

Plaintiff issued the College a general liability insurance policy covering the period from September 1, 2014 to September 1, 2015. (P's 56.1 Stmt. and Resp. ¶ 22; Burke Aff. Ex. 1 (the "Policy").) The Policy names "Nyack College & Business Office" as the named insured and it does not list any individuals as insureds or additional insureds. (Policy at BMG33-38.) This case potentially implicates the following coverages: the Commercial Liability Coverage; the College/University ("C/U") Additional Coverage; and the Sexual Acts Coverage. (*See id.* at BMG33, 59, 180, 204.)

**1.      Commercial Liability Coverage**

The Commercial Liability Coverage provides four principal coverages: Coverage L covers bodily injury and property damage; Coverage M covers medical payments; Coverage N

covers bodily injury and property damage arising from products/completed work hazards; and

Coverage O covers property damage caused by fire. (*Id.* at BMG62-63.)[5] Coverage M provides:

> We pay all sums which an insured becomes legally obligated to pay as damages
> due to bodily injury or property damage to which this insurance applies. The bodily
> injury or property damage must be caused by an occurrence which takes place in
> the coverage territory, and the bodily injury or property damage must occur during
> the policy period.

(*Id.* at BMG62 (emphasis omitted).) The Commercial Liability Coverage defines "insured" to

include the College's "employees, for acts within the scope of their employment." (*Id.* at

BMG60-61 (emphasis omitted).) "Bodily injury" is defined as "bodily harm, sickness or disease

sustained by a person and includes required care and loss of services" and "does not include

mental or emotional injury, suffering, or distress that does not result from a physical injury." (*Id.*

at BMG60.) The Commercial Liability Coverage also contains a defense coverage provision,

which provides that Plaintiff has "the right and duty to defend a suit seeking damages which may

be covered under the Commercial Liability Coverage. [Plaintiff] may make investigations and

settle claims or suits [that Plaintiff] decide[s] are appropriate." (*Id.* at BMG64 (emphasis

omitted).)

2.      C/U Additional Coverages

The C/U Additional Coverages Endorsement (the "C/U Endorsement") provides six

additional coverages, one of which is implicated in this case – the Student Emotional Injury

Liability Coverage (the "Emotional Injury Coverage"). (*Id.* at BMG180-83.) Pursuant to the

Emotional Injury Coverage, Plaintiff is obligated to "pay all sums that a covered person becomes

legally obligated to pay as damages due to emotional injury to which this coverage applies." (*Id.*

---

[5] The Commercial Liability Coverage also includes coverage for the following: incidental contractual liability, incidental medical malpractice injury, and bodily injury or property damage resulting from mobile equipment. (*Id.* at BMG63-64.)

at BMG181 (emphasis omitted).)  "Emotional injury" is defined as "mental or emotional injury, suffering or distress sustained by a person other than as a result of physical injury.  Emotional injury does not include bodily injury, property damage, personal injury or financial damage of any kind."  (*Id.* at BMG272 (definition in Liability and Medical Coverage Form) (emphasis omitted); *see id.* at BMG180 (incorporating terms of Liability and Medical Coverage Form into C/U Endorsement).)  "The emotional injury must[, among other things,] be sustained by [a College] student, and the event or events causing the emotional injury . . . must arise out of [the College's] evaluation, discipline or graduation practices . . . ."  (*Id.* at BMG181 (emphasis omitted).)  This coverage, however, "does not apply . . . if the emotional injury arises out of any discriminatory act, sexual act, or counseling act."  (*Id.* (emphasis omitted).)  "Sexual act" means:

> (a) any act that would be considered a criminal act under any applicable federal, state or local statute, ordinance or law relating to sexual offenses; or
> (b) any actual or attempted touching of a person by another person for the purpose of obtaining sexual arousal or sexual gratification; or
> (c) any other act undertaken by a person for the purpose of obtaining sexual arousal or sexual gratification; or
> (d) any conduct characterized or interpreted as sexual harassment; or
> (e) any conduct characterized or interpreted as being sexual in nature.

(*Id.* at BMG273 (definition in Liability and Medical Coverage Form); *see id.* at BMG180 (incorporating terms of Liability and Medical Coverage Form into C/U Endorsement).)  The Policy provides that "[a]ny of the above acts or conduct will be considered a single sexual act if undertaken by the same perpetrator or perpetrators, even if such acts are directed against more than one person, happen over time, or take place during more than one policy period."  (*Id.* at BMG273 (emphasis omitted).)  Sexual harassment is defined as:

> [O]nly those sexual acts involving conduct that is characterized or interpreted as sexual intimidation or sexual harassment, or as intimidation or harassment based on a person's gender.  Any such conduct will be considered a single sexual harassment incident if undertaken by the same perpetrator or perpetrators, even if

such conduct is directed against more than one person, happens over time, or takes place during more than one policy period.

(*Id.* at BMG273-274 (emphasis omitted).)

The C/U Endorsement defines "[c]overed person" to include the College's "employees . . . , but only while acting on [the College's] behalf and within the scope of their delegated authority." (*Id.* at BMG180.) The C/U Endorsement does not contain a defense coverage provision, (*see id.* at BMG180-83), but it does note that "[a]ll other provisions of the Commercial Liability Coverage Form . . . apply to each of the Additional Coverages of this endorsement, unless otherwise modified herein," (*id.* at BMG183).

          3.    <u>Sexual Acts Coverage</u>

The Sexual Acts Liability Coverage Endorsement (the "Sexual Acts Endorsement") provides six additional coverages, three of which are relevant to this case: Sexual Acts Liability Coverage ("Sexual Acts Coverage"), Sexual Harassment Liability Coverage (Other Than Your Employees) ("Sexual Harassment Coverage"), and Defense Coverage: Alleged Perpetrators ("Defense Coverage for Alleged Perpetrators"). (*Id.* at BMG205-07.) "Covered person[s]" under the Sexual Acts and Sexual Harassment Coverages include the College's "employees . . . , but only while acting on [the College's] behalf, for [the College's] benefit, and within the scope of their delegated authority." (*Id.* at BMG205.) The Sexual Acts Endorsement defines "sexual act" and "sexual harassment" the same way the C/U Endorsement does. (*Compare* BMG204-05, *with* BMG273-74.)

The Defense Coverage for Alleged Perpetrators states that "[t]he commission of a sexual act will not be considered to have occurred within the scope of anyone's delegated authority, but if a person otherwise covered herein denies involvement in the sexual act, then [Plaintiff] will provide the alleged perpetrator with . . . limited Defense Coverage." (*Id.* at BMG207 (emphasis

omitted).)  The defense coverage will not be provided, however, if at the time a suit is filed against the alleged perpetrator, the alleged perpetrator has been found by any branch of any level of government or a civil court to have committed the sexual act, has admitted to the act, or has been implicated by clear and convincing physical evidence.  (*Id.*)  "Alleged perpetrator" means "a covered person accused of committing a sexual act."  (*Id.* at BMG204 (emphasis omitted).)

### D.  Related Criminal Proceeding and Admissions of Wrongdoing

In March 2015, while still in Arizona, Davie terminated Defendant.  (Doc. 69 ("Schlossberg Reply Aff.") Ex. B at 9.)[6]  In an email dated March 14, 2015, Defendant apologized to Davie "for creating a situation that left [Davie] with no option but to make a change," admitted that his "actions [were] inexcusable," and acknowledged that "[t]here is no place in athletics for . . . an individual to create an uncomfortable environment, no matter what the scenario."  (Schlossberg Aff. Ex. C at 1.)

---

[6] Defendant objects to Plaintiff relying on Doc. 65 ("Schlossberg Aff.") Ex. C, which is an email from him to Davie, as well as Defendant's statement to the police, alleging that Plaintiff cannot authenticate either exhibit.  (D's 56.1 Stmt. & Resp. at 2; Doc. 78 ("D's Opp.") at 19.)  He also objects to Plaintiff's use of the twelve Team members' statements to the police and other police documents, claiming they are unauthenticated and contain inadmissible hearsay.  (Doc. 80 at 1.)  As to the authenticity issue, the Plaintiff has not offered an affidavit from a custodian establishing the authenticity of any of these exhibits.  Nonetheless, the Court "has the discretion to consider unauthenticated or otherwise objectionable evidence where it is apparent that the party may be able to authenticate and establish the admissibility of those documents at trial."  *Am. Ref-Fuel Co. of Niagara, LP v. Gensimore Trucking, Inc.*, No. 02-CV-814, 2007 WL 2743449, at *3 n.3 (W.D.N.Y. Sept. 18, 2007); *see Delgado v. City of Stamford*, 2015 WL 6675534, at *5 n.3 (D. Conn. Nov. 2, 2015) (considering unauthenticated exhibits on motion for summary judgment and allowing party to authenticate exhibits at trial; *Kramsky v. Chetrit Grp., LLC*, No. 10-CV-2638, No. 11-CV-1735, 2011 WL 2326920, at *2 (S.D.N.Y. June 13, 2011) ("Where the Defendants would have the opportunity to authenticate these exhibits at trial, the Court will not strike them at this stage.").  Nothing about these exhibits suggest that Plaintiff would be unable to establish their authenticity at trial:  Plaintiff could have Defendant or Davie authenticate the email, and a proper custodian could authenticate the police documents, which were apparently produced to Plaintiff by the chief of police, (Schlossberg Reply Aff. Ex. B at 1).  As to Defendant's hearsay objection, the Team members' statements to the police are not considered for their truth, just for the fact that they were said, and Defendant's own statements are admissions and therefore not hearsay.  Accordingly, the Court will consider Defendant's email to Davie and the police documents, including Defendant's and the Team members' statements to the police.

Between March 16, 2015 and April 1, 2015, the South Nyack Police Department collected twelve statements from Team members.  (Schlossberg Reply Aff. Ex. B at 33, 35, 37, 39, 41, 45-46, 48, 50, 52, 54, 56, 58.)[7]  The statements describe Defendant engaging in conduct similar to that alleged in the Underlying Complaints:  inappropriate contact (*e.g.*, smacking buttocks, touching breasts, kissing, and licking); talking graphically about sex; directing a Team member to dance with a stranger during the Alcohol Outing and then dancing with her; asking a Team member if she considered a career as a stripper; inviting a pornographic actress to speak to the team; and shaking a Team member's breasts and proclaiming, "This is what top tits looks like."  (*Id.* at 50; *see id.* at 33, 35, 37, 39, 41, 45-46, 48, 52, 54, 56, 58.)

On April 8, 2015, the Rockland County District Attorney's office charged Defendant with multiple counts of forcible touching and harassment.  (*See id.* at 32, 34, 36, 38, 40, 44, 47, 49, 51, 53, 55, 57; Burke Aff. Ex. 21 (providing three misdemeanor informations).)[8]  Not all of the Underlying Plaintiffs, however, were the subjects of the criminal charges.  (*See* Burke Aff. Ex. 18 at 50:1-51:1 (court observing that Y. Doe and A. Doe submitted information to the court prior to hearing, but were not subject of charges).)

On April 9, 2015, Defendant gave a voluntary statement to an officer with the South Nyack Police Department.  (Schlossberg Aff. Ex. D.)  It begins:

> I, [Defendant], after speaking with Det. Coyle and hearing the statements from the Nyack Softball team admit that these things did occur.  I exercised terrible judgment and went far beyond the parameters of my job description.  No matter the intent, there was unwanted touching/contact and there is no excuse for that.  In addition, several discussions should *never* have occurred and their subject matter (sex, etc.) has no place nor no business being discussed.

---

[7] The police collected another statement from a Team member on April 13, 2015.  (*Id.* at 43.)

[8] The victims' names in the misdemeanor informations and accompanying supporting depositions provided by Plaintiff are whited-out.  (Schlossberg Reply Aff. Ex. B at 32-58.)  Defendant provided three of the misdemeanor informations, identifying K. Doe, S. Doe, and M. Doe as three of the victims.  (Burke Aff. Ex. 21.)

(*Id.* at 1.)  Defendant also admitted that he "got too comfortable in the coach/player relationship and crossed lines."  (*Id.* at 2.)  He specifically admitted to "teas[ing] and singl[ing] out [one Team member] far too often," having "far too [many] in depth conversations with [two other Team members]," and kissing another Team member.  (*Id.*)  The Rockland County District Attorney's office charged Defendant with additional counts of forcible touching and harassment on April 13, 2015.  (Schlossberg Reply Aff. Ex. B at 42.)

Defendant pleaded guilty on January 21, 2016 to seven counts of forcible touching. (*See* Burke Aff. Ex. 20 at 3:16-21.)  But on June 29, 2016, the state court vacated that plea and Defendant pleaded guilty to seven counts of first-degree felony coercion.  (*Id.* at 3:20-4:12.)  At his sentencing on September 16, 2016, Defendant admitted to, among other things, subjecting certain "members of [the] softball team" to "unwanted sexual contact for the purpose of degrading and abusing [them] . . . and for the purpose of gratifying [his] own sexual desires" during September 1, 2014 through February 28, 2015.  (Doc. 42 ("FAC") Ex. A at 8:18-10:14.)

### E.    Defense Coverage in the Underlying Actions

By letter dated February 1, 2016, Plaintiff informed Defendant that after investigating the allegations in the civil lawsuits against Plaintiff, it would – based on that investigation and the policy language – deny him coverage for the six lawsuits Team members had filed the previous fall.  (Burke Aff. Ex. 22.)  The letter also stated that "it is [Plaintiff's] understanding that [Defendant] ha[d] pled guilty to numerous counts of forcible touching, a criminal sexual act. Therefore, there would be no coverage for [Defendant] in the related civil matter."  (*Id.* at BMG3.)

In a letter dated March 9, 2016, Defendant's counsel requested that Plaintiff provide Defendant with a defense and indemnification in the Underlying Actions and advised Plaintiff

that its reason for denying coverage was incorrect. (Burke Aff. Ex. 23.) In a letter dated March 15, 2016, Plaintiff agreed to provide Defendant with defense coverage, in the form of reimbursement for litigation costs at $185 per hour. (Burke Aff. Ex. 24.) Plaintiff has been paying Defendant's counsel for legal fees. (Burke Aff. Ex. 15 ¶ 15; *id.* Ex. 16 ¶ 6; *id.* Ex. 2 at 5-6.) By letter dated July 8, 2016, Plaintiff informed Defendant that it was reserving its rights to deny Defendant coverage in connection with the Underlying Actions. (FAC Ex. F.)

### F. Procedural History

Plaintiff brought this action on August 11, 2016, seeking a declaration that it is not obligated to defend, indemnify, or provide any other coverage to Defendant in connection with the Underlying Actions. (Doc. 1.)[9] After Plaintiff submitted its First Amended Complaint, (Doc. 42), Defendant answered, (Doc. 43). The parties proceeded through discovery and then filed their cross-motions for summary judgment. (Docs. 64, 67.)[10]

## II. LEGAL STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[T]he dispute about a material fact is 'genuine' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" if it "might affect the outcome of the suit

---

[9] Brotherhood Mutual Insurance Services LLC was initially named as plaintiff. (*Id.*) After learning that Brotherhood Mutual Insurance Company probably issued the policy, (Doc. 40 at 4:6-12), Plaintiff submitted an amended complaint, naming Brotherhood Mutual Insurance Company as the plaintiff, (Doc. 42).

[10] On May 21, 2018, Plaintiff moved to substitute its counsel, (Doc. 86), which the Court granted, (Doc. 88).

under the governing law . . . .  Factual disputes that are irrelevant or unnecessary will not be

counted." *Id.*

On a motion for summary judgment, "[t]he evidence of the non-movant is to be believed,

and all justifiable inferences are to be drawn in his favor." *Id.* at 255.  The movant bears the

initial burden of demonstrating "the absence of a genuine issue of material fact," and, if satisfied,

the burden then shifts to the non-movant to present "evidence sufficient to satisfy every element

of the claim." *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008) (citing *Celotex Corp. v.

Catrett*, 477 U.S. 317, 323-24 (1986)).  "The mere existence of a scintilla of evidence in support

of the [non-movant's] position will be insufficient; there must be evidence on which the jury

could reasonably find for the [non-movant]." *Anderson*, 477 U.S. at 252.  Moreover, the non-

movant "must do more than simply show that there is some metaphysical doubt as to the material

facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and he

"may not rely on conclusory allegations or unsubstantiated speculation," *Fujitsu Ltd. v. Fed.

Express Corp.*, 247 F.3d 423, 428 (2d Cir. 2001) (internal quotation marks omitted).

"A party asserting that a fact cannot be or is genuinely disputed must support the

assertion by . . . citing to particular parts of materials in the record, including depositions,

documents, electronically stored information, affidavits or declarations, stipulations (including

those made for purposes of the motion only), admissions, interrogatory answers, or other

materials . . . ."  Fed. R. Civ. P. 56(c)(1).  Where an affidavit is used to support or oppose the

motion, it "must be made on personal knowledge, set out facts that would be admissible in

evidence, and show that the affiant . . . is competent to testify on the matters stated."  Fed. R.

Civ. P. 56(c)(4); *see Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 310 (2d

Cir. 2008).  In the event that "a party fails . . . to properly address another party's assertion of

fact as required by Rule 56(c), the court may," among other things, "consider the fact undisputed for purposes of the motion" or "grant summary judgment if the motion and supporting materials – including the facts considered undisputed – show that the movant is entitled to it." Fed. R. Civ. P. 56(e)(2)-(3).

The fact that both sides seek summary judgment, and thus presumably believe that there are no genuine issues of material fact in dispute, does not mean that the Court must grant judgment as a matter of law for one side or the other. *See Eastman Mach. Co. v. United States*, 841 F.2d 469, 473 (2d Cir. 1988); *Rhoads v. McFerran*, 517 F.2d 66, 67 (2d Cir. 1975).

## III.    DISCUSSION

### A.    Duty to Defend Framework

"In New York, an insurer's duty to defend is 'exceedingly broad' and distinct from the duty to indemnify." *Euchner-USA, Inc. v. Hartford Cas. Ins. Co.*, 754 F.3d 136, 140 (2d Cir. 2014) (quoting *Auto. Ins. Co. of Hartford v. Cook*, 850 N.E.2d 1152, 1155 (N.Y. 2006)).[11] While "the duty to [indemnify] is determined by the actual basis for the insured's liability to a third person," "[t]he duty to defend is measured against the allegations of pleadings." *Id.* (quoting *Servidone Const. Corp. v. Sec. Ins. Co. of Hartford*, 477 N.E.2d 441, 444 (N.Y. 1985)). "The duty to defend remains 'even [if] facts outside the four corners of the pleadings indicate that the claim may be meritless or not covered.'" *Id.* (alterations omitted) (quoting *Cook*, 850 N.E.2d at 1155).

---

[11] Neither party addresses which state's substantive law governs the Policy, but the Court will apply New York law for three reasons.  First, the policyholder (the College) is located in New York and many of the underlying events occurred in New York.  Second, there is no reason to find that Indiana or California (Plaintiff's and Defendant's states of citizenship) have sufficient contact with the Policy, which provided insurance coverage to a school in New York.  (FAC ¶¶ 1, 3-4.)  Third, the parties' briefs rely on New York law.  *See Motorola Credit Corp. v. Uzan*, 388 F.3d 39, 61 (2d Cir. 2004) ("[T]he parties' briefs assume that New York law controls this issue, and such implied consent . . . is sufficient to establish choice of law.") (second alteration in original) (internal quotation marks omitted).

"[A]n insurer will be called upon to provide a defense whenever the allegations of the complaint 'suggest . . . a reasonable possibility of coverage.'" *Id.* at 141 (alterations in original) (quoting *Cook*, 850 N.E.2d at 1155). "If, liberally construed, the claim is within the embrace of the policy, the insurer must come forward to defend its insured no matter how groundless, false or baseless the suit may be." *Id.* (quoting *Cook*, 850 N.E.2d at 1155). The "duty to defend the entire action is triggered even if only one claim is potentially covered by the insurance policy." *Mass. Bay Ins. Co. v. Penny Preville, Inc.*, No. 95-CV-4845, 1996 WL 389266, at *4 (S.D.N.Y. July 10, 1996) (citing *Seaboard Sur. Co. v. Gillette Co.*, 476 N.E.2d 272, 275 (N.Y. 1984)). "[A] defense obligation may be avoided only where there is 'no possible factual or legal basis' on which an insurer's duty to indemnify under any provision of the policy could be held to attach." *Century 21, Inc. v. Diamond State Ins. Co.*, 442 F.3d 79, 82-83 (2d Cir. 2006) (quoting *Servidone*, 477 N.E.2d at 444). "When an exclusion clause is relied upon to deny coverage, 'the burden rests upon the insurance company to demonstrate that the allegations of the complaint can be interpreted only to exclude coverage.'" *Vill. of Piermont v. Am. Alternative Ins. Corp.*, 151 F. Supp. 3d 438, 448 (S.D.N.Y. 2015) (quoting *Town of Massena v. Healthcare Underwriters Mut. Ins. Co.*, 779 N.E.2d 167, 170 (N.Y. 2002)).

### B. Application

The provisions that could provide defense coverage for Defendant in the Underlying Actions are located in two endorsements: the C/U Endorsement's Emotional Injury Coverage and Sexual Acts Endorsement. (*See* Doc. 66 ("P's Mem.") at 7-18 (arguing Defendant is not entitled to Emotional Injury, Sexual Acts, and Sexual Harassment Coverages, as well as Defense Coverage for Alleged Perpetrators); D's Opp. at 15-27 (arguing the opposite).) Both endorsements provide certain coverages defined therein to "covered person[s]," defined as the

College's "employees . . . , but only while acting on [the College's] behalf and within the scope of their delegated authority." (Policy at BMG180, 205 (emphasis omitted).)[12] The Defense Coverage for Alleged Perpetrators, however, notes that "[t]he commission of a sexual act will not be considered to have occurred within the scope of anyone's delegated authority," but still obligates Plaintiff to provide defense coverage if "a person otherwise covered herein denies involvement in the sexual act." (*Id.* at BMG207 (emphasis omitted).) Thus, the Court will consider the Defense Coverage for Alleged Perpetrators separately from the coverages that apply to "covered persons" (the Emotional Injury, Sexual Acts, and Sexual Harassment Coverages).

1.  Whether Plaintiff Has a Duty to Defend Under the Emotional Injury, Sexual Acts, or Sexual Harassment Coverages

As to the Emotional Injury, Sexual Acts, and Sexual Harassment Coverages, the threshold question is whether the Underlying Complaints allege that Defendant was acting within the scope of his delegated authority. The parties focus, however, on a different question: whether Defendant meets the definition of "insured," defined as the College's "employees, for acts *within the scope of their employment*." (Policy at BMG61 (emphasis added); *see* P's Mem. at 7-12; D's Opp. at 5-9.) But whether the Emotional Injury, Sexual Acts, and Sexual Harassment Coverages cover an individual turns on whether the individual is a "covered person," not an "insured." "Insured" is a term applicable to the principal coverages in the Commercial Liability Coverage (Coverages L and N). (Policy at BMG62 ("We pay all sums which an *insured* becomes legally obligated to pay . . . ."); *id.* at BMG63 (same).) And there is no possible basis that Plaintiff is obligated to defend Defendant in the Underlying Actions based on Coverages L and N because those coverages cover bodily injury and property damage, neither of

---

[12] The "covered person" definition in the Sexual Acts Endorsement also requires the individual to act for the "benefit" of the College. (*Id.* at BMG205.)

which were alleged in the Underlying Complaints. (*Id.* at BMG62-63.) So whether Defendant is an "insured" is not the issue.

Nonetheless, the parties' arguments with regard to scope of employment are useful. The Policy does not define "scope of employment" or "scope of delegated authority." The parties are silent as to whether there is a difference between the terms such that Defendant could be acting within one scope but not the other. And there appears to be no real daylight between the ordinary meanings of those phrases. *Compare Scope of Employment*, Black's Law Dictionary (10th ed. 2014) (defining "scope of employment" as "[t]he range of reasonable and foreseeable activities that an employee engages in while carrying out the employer's business"), *with Scope of Authority*, Black's Law Dictionary (10th ed. 2014) (defining "scope of authority" as "[t]he range of reasonable power that an agent has been delegated or might foreseeably be delegated in carrying out the principal's business"). While the Policy uses the term "scope of . . . *delegated* authority," (Policy at BMG180, 205), there is no reason to find that phrase to mean something different from "scope of authority." Thus, in addressing the threshold question of whether Defendant was acting within the scope of his delegated authority, the Court will address the parties' scope-of-employment arguments. If there is "no possible factual or legal basis on which" Defendant was acting within the scope of his employment, then there is "no possible factual or legal basis on which" Defendant was acting within the scope of his delegated authority, and vice versa. *Servidone*, 477 N.E.2d at 444.

The scope-of-employment analysis turns, in part, on the nature of the alleged acts. Thus, the Court will first analyze whether Defendant could be covered for the general and specific allegations that he perpetuated a sexually-charged atmosphere, including the unwanted touching and inappropriate sexual comments. (*See* K. Doe SAC ¶¶ 24-25.) Then, the Court will consider

the alleged nonsexual acts: threatening team members; setting study hall restrictions; setting restrictions on contact with parents; confiscating cellular phones; facilitating the Alcohol Outing (or at least the part that can be construed as nonsexual); and booking the house for the Arizona Tournament. (*See id.* ¶¶ 21, 24(f)-(g).)

a. *Whether Defendant's Alleged Sexual Acts Were Within the Scope of his Employment*

"An employee acts within the scope of his employment if 'the [relevant] act was done while the [employee] was doing [the employer's] work, no matter how irregularly.'" *Lowy v. Travelers Prop. & Cas. Co.*, No. 99-CV-2727, 2000 WL 526702, at *3 (S.D.N.Y. May 2, 2000) (first alteration in original) (quoting *Riviello v. Waldron*, 391 N.E.2d 1278, 1281 (N.Y. 1979)). Determining whether a particular act was within the scope of the employee's employment "is heavily dependent on factual considerations and is therefore ordinarily a question for the jury[, but] where . . . there is no conflicting evidence as to the essential facts, a court may make this determination as a matter of law." *Pizzuto v. Cty. of Nassau*, 239 F. Supp. 2d 301, 313-14 (E.D.N.Y. 2003) (citation omitted). The relevant factors include:

> the connection between the time, place and occasion for the act; the history of the relationship between employer and employee as spelled out in actual practice; whether the act is one commonly done by such an employee; the extent of departure from normal methods of performance; and whether the specific act was one that the employer could reasonably have anticipated.

*Riviello*, 391 N.E.2d at 1281; *see Golodner v. Quessant Inc.*, No. 05-CV-7895, 2007 WL 2844944, at *4 (S.D.N.Y. Sept. 27, 2007) (applying *Riviello* as a five-factor standard); *Lowy*, 2000 WL 526702, at *3 (applying *Riviello* as a four-factor standard). Courts also consider whether the "employee's act [was] in furtherance of the employer's interests." *Rausman v. Baugh*, 682 N.Y.S.2d 42, 44 (2d Dep't 1998) (citing *Sims v. Bergamo*, 147 N.E.2d 1, 3 (N.Y. 1957)); *see Lowy*, 2000 WL 526702, at *3. "New York courts generally place greater emphasis

on . . . whether the acts involved . . . could reasonably have been anticipated by [the] employer."

*Riascos-Hurtado v. United States*, No. 09-CV-3, 2015 WL 3603965, at *4 (E.D.N.Y. June 5, 2015) (first and second alterations in original); *see Adorno v. Corr. Servs. Corp.*, 312 F. Supp. 2d 505, 517 (S.D.N.Y. 2004).  Even if an employee committed an intentional assault, he is considered to be acting within the scope of his or her employment if "the nature of the employee's duties made it foreseeable that such an assault would take place."  *Adorno*, 312 F. Supp. 2d at 517; *see Sims*, 147 N.E.2d at 2-3 (bartender's assault of an unruly patron "to protect the employer's property and to maintain order on premises" considered within the scope of the bartender's employment); *Cepeda v. Coughlin*, 513 N.Y.S.2d 528, 530 (3d Dep't 1987) (correction officers were acting within scope of their employment when they used excessive force because "[c]ustody and control of inmates and the maintenance of prison safety and security are the primary duties and responsibilities of correction officers").

Turning to the first factor, the time, place, and occasion of the acts, most of Defendant's alleged sexual acts occurred at Team games and practices or on school-sanctioned trips.  But some of the acts – such as the Alcohol Outing and a meeting with a porn actress at Defendant's home – took place elsewhere.  (*See* K. Doe SAC ¶¶ 22, 24(f).)  So this factor tilts somewhat in favor of coverage.

As to the history of the employer-employee relationship, the Underlying Complaints allege that Davie had "notice of [Defendant's] actions but turned a blind eye to the sexual harassment until he could no longer claim ignorance of [Defendant's] behavior."  (*Id.* ¶ 28.) During the first instance described, the Alcohol Outing, Davie granted Defendant's request to use a College van and observed the Team members wearing cocktail attire before leaving for the outing.  (*Id.* ¶ 28(a).)  This allegation, however, hardly signals an actual practice of sexual

harassment, let alone Davie's knowledge of it. The other allegations, pertaining to incidents at the Arizona Tournament in March 2015, occurred days before Team members complained to Davie about Defendant's harassment and Defendant was fired. (*Id.* ¶ 28(b)-(e); *see id.* ¶ 26.) These allegations suggest that Davie took swift action once his observations of improper behavior accumulated and someone complained about Defendant's conduct. But assuming Davie's observations put him on notice for a few days, that is not a history that suggests that Defendant's acts were part of his work for the college. It does not follow that Davie's observations somehow expanded the scope of Defendant's employment to include sexual harassment of Team members. *See Adorno*, 312 F. Supp. 2d at 517 (principle that "tortious sexual activity generally is entirely divorced from the nature of an employment position" is not altered by employer having notice of perpetrator's "propensity to commit sexual acts"); *Lippold v. Duggal Color Projects, Inc.*, No. 96-CV-5869, 1997 WL 529014, at *1 (S.D.N.Y. Aug. 25, 1997) ("The fact that plaintiff alleges that [the company] was on notice of [the employee's] activities goes to [the company's] liability, but does not affect the analysis of whether [the employee's] conduct was within the scope of his employment for insurance coverage purposes."). *But see Lowy*, 2000 WL 526702, at *4 (reasonably foreseeable to hospital that a doctor would handcuff a registrar for failing to prepare paperwork where doctor allegedly engaged in humiliating and demeaning behavior toward female co-workers prior to handcuffing incident and hospital knew about such behavior). Thus, this factor weighs against a finding that Defendant was acting within the scope of his employment.

Next, as to the third factor, it cannot be said that Defendant's alleged sexual acts were "commonly done" by any type of coach, or are anything other than a departure "from the normal

methods of performance." *Riviello*, 391 N.E.2d at 1281. Thus, this factor weighs in favor of a finding that Defendant was not acting within the scope of his employment.

The next factor – whether the specific act was one that the College could reasonably have anticipated – weighs against finding the alleged sexual acts occurred within the scope of Defendant's employment. This is not like a correction officer using excessive force to maintain order or a bartender committing assault to remove an unruly patron from a bar. In these examples, using force can be part of the job. It is safe to say that sexually harassing players is not remotely within the job description of softball coach. One could imagine a case where a coach legitimately might touch a player for instructional purposes (*i.e.*, standing behind a player while holding her arms to teach a batting stance), but the allegations here are not of an ambiguous or potentially misunderstood sort. The employer would have no reason to anticipate the kind of touching or comments at issue here. *See Bloomer v. Becker Coll.*, No. 09-CV-11342, 2010 WL 3221969, at *1, *8 (D. Mass. Aug. 13, 2010) (equestrian coach was not acting within scope of his employment when he made sexually inappropriate comments to team members about clothes they should wear at competitions and touched players' breasts while applying anti-inflammatory cream to their shoulders); *id.* at *8 ("Presumably, some level of touching is involved in [coaching equestrian], but surely sexual contact is not required."); *see Golodner*, 2007 WL 2844944, at *5 ("[T]he nature of [perpetrator-employee's] duties as dishwasher did not mandate physical contact with bar or restaurant patrons.").

Finally, the Court considers the extent to which Defendant's alleged acts were in furtherance of the College's interests, if at all. It is well established that "sexual misconduct and related tortious behavior arise from personal motives and do not further an employer's business, even when committed within the employment context." *Adorno*, 312 F. Supp. 2d at 517

(collecting N.Y. cases); *see George v. N.Y.C. Transit Auth.*, No. 04-CV-3263, 2008 WL 4274362, at *3 (E.D.N.Y. Sept. 17, 2008) ("Acts of workplace harassment and other intentional torts are generally not considered conduct within the scope of employment since they are often motivated by personal reasons.") (collecting N.Y. cases). Defendant argues that his alleged sexual acts were committed as "instruction for softball errors or performance." (D's Opp. at 13.) Not only is that characterization not supported by the allegations in the Underlying Complaints,[13] but no rational person would find instructional value in asking players about their sex lives, licking their ears, or grabbing their breasts and buttocks while making inappropriate comments. The Underlying Complaints do not allege that Defendant's conduct was in furtherance of the College's interest or bore any relation to softball instruction, as Defendant claims. As alleged, Defendant's conduct served one purpose: his own desire to gratify himself by humiliating and intimidating Team members.

In sum, even if Defendant's alleged sexual acts occurred on College time, such acts are not considered within the scope of an employee's employment. *See Lippold*, 1997 WL 529014, at *1 (no duty to defend where "[t]he alleged actions may have occurred on company time, but they were carried out for personal motives and not to further an interest of [the company]."). Thus, the Court concludes that there is no basis for finding that Defendant was acting within the scope of his employment when he allegedly committed the sexual acts described in the Underlying Complaints.

Defendant counters by citing *Village of Piermont*, 151 F. Supp. 3d 438, for the proposition that where "the [u]nderlying [c]omplaint allege[s] that an individual was acting

---

[13] In one instance Defendant is alleged to have licked K. Doe's ear – an act he called an "ear fuck" – as punishment for K. Doe being the losing pitcher in a game. (K. Doe SAC ¶ 25(j).) The notion that an employer could reasonably anticipate, or benefit from, that sort of "coaching" is ludicrous.

within the scope of his employment, that allegation must control in assessing the duty to defend," (D's Opp. at 7), and noting that the Underlying Complaints allege that his acts were done "in his capacity" as the softball coach, and "occurred during the course and within the scope of his employment as" softball coach, (D's Opp. at 5-9; K. Doe SAC ¶¶ 1, 62, 76. 92). Thus, Defendant's approach would have the Court disregard the fact allegations in the Underlying Complaints that indicate that Defendant was not acting within the scope of his employment. The Court declines to adopt this approach for three reasons.

First, "the [duty-to-defend] analysis depends on the facts which are pleaded [in the underlying complaint], not [its] conclusory assertions." *See Allstate Ins. Co. v. Mugavero*, 589 N.E.2d 365, 370 (N.Y. 1992); *see id.* at 371 (no coverage where no evidentiary support in complaint or motion papers for complaint's conclusory characterization of conduct); *Int'l Paper Co. v. Cont'l Cas. Co.*, 320 N.E.2d 619, 622 (N.Y. 1974) (insurer's duty to defend turns on whether "injured party . . . *can state facts* which bring the injury within the coverage") (emphasis added)); *see also Cowan v. Codelia, P.C.*, No. 98-CV-5548, 1999 WL 1029729, at *6 (S.D.N.Y. Nov. 10, 1999) (analysis of duty to defend requires focus on factual allegations in underlying complaint, not conclusory allegations) (collecting cases). The injured party's characterization thus does not drive the duty-to-defend determination.

Second, *Village of Piermont* is distinguishable. The underlying complaint in *Village of Piermont* alleged that members of the municipal fire department physically restrained the underlying plaintiff's son and forced him to engage in acts of sodomy as part of a hazing ritual for joining the department. *See Vill. of Piermont*, 151 F. Supp. 3d at 441. The underlying complaint also alleged that the municipality "promulgated, fostered and implemented" the hazing and deemed it "a prerequisite [to] acceptance into [the Department]," and that the hazing was

"undertaken in furtherance of [the Individual Defendants'] positions as volunteer firefighters . . . and pursuant to an accepted policy of [the Department] and thus within the scope of their duties and authority." *Id.* (alterations in original) (internal quotation marks omitted). In an affidavit, the fire department's chief said that the hazing was outside the scope of duties of a volunteer firefighter, but the court disregarded his characterization because it was outside of the underlying complaint. *See id.* at 448-49. Here, unlike in *Village of Piermont*, 1) the Underlying Complaints, not an affidavit from an interested party, refute the notion that Defendant's alleged sexual acts were within the scope of his employment, and 2) the Underlying Complaints do not allege that Defendant's conduct was in furtherance of a College policy. (*See generally* K. Doe SAC.) And *Village of Piermont*, while decided by a respected colleague, is not binding and does not engage with the precedent discussed above.[14]

Third, Defendant's argument that that authority is irrelevant, because those cases "address the scope of employment in the context of vicarious liability for intentional conduct [as opposed to the duty-to-defend context] and none are Title IX cases," (D's Opp. at 8), is without merit. Defendant ignores cases where courts, in determining whether an underlying complaint triggered an insurer's duty to defend, considered the facts alleged in the underlying complaint and applied the scope-of-employment precedent. *See George*, 2008 WL 4274362, at *2-3 (applying scope-of-employment precedent when determining whether underlying complaint triggered public entity's statutory obligation to defend underlying action); *Lowy*, 2000 WL

_____

[14] Defendant also cites *Bonilla v. Town of Hempstead*, another duty-to-defend case, for the following boilerplate proposition: "The duty to defend is broader than the duty to indemnify and it is triggered if the civil complaint includes allegations that the employee was acting within the scope of his or her employment at the time of the alleged wrongdoing." 16 N.Y.S.3d 594, 596 (2d Dep't 2015) (citation omitted). *Bonilla* does not describe the allegations in the underlying complaint in any detail, and Defendant does not discuss the case beyond the quotation above. Thus, *Bonilla* is not useful.

526702, at *3-4 (applying scope-of-employment precedent when determining whether underlying complaint triggered private insurer's duty-to-defend); *Lippold*, 1997 WL 529014, at *1 (same); *McKay v. Healthcare Underwriters Mut. Ins. Co.*, 743 N.Y.S.2d 593, 595 (3d Dep't 2002) (same); *Somers v. Titan Indem. Co.*, 735 N.Y.S.2d 614, 615 (2d Dep't 2001) (same).[15]

Defendant distinguishes *Lippold*, noting that the insurance policy in that case did not contain a sexual harassment liability policy, (D's Opp. at 12), but whether a claim arose under a general liability policy, as in *Lippold*, or under a specific additional coverage, as here, has no effect on the issue of scope of employment. That insurance exists for a particular type of liability does not constitute a finding that such conduct is necessarily within the scope of the actor's employment in a given case.[16]

---

[15] Defendant does not explain why the scope-of-employment precedent would not apply in the Title IX context, and the Court finds no reason why it would not. *See Romero v. City of N.Y.*, 839 F. Supp. 2d 588, 630 (E.D.N.Y. 2012) (Title IX case finding that teacher's "conduct with respect to his illegal sexual relationship with [a student] f[ell] outside the scope of his . . . employment and was clearly not in furtherance of his employer's interest"); *id.* at 629-630 ("New York courts consistently have held that sexual misconduct and related tortious behavior arise from personal motives and do not further an employer's business, even when committed within the employment context.") (internal quotation marks omitted).

[16] One may wonder as to the purpose of providing the Sexual Acts and Sexual Harassment Coverages if an employee's sexual acts will prevent him or her from meeting the definition of "covered person." Those coverages, however, might conceivably apply if an underlying complaint alleged *quid pro quo* sexual harassment. *See Zion Christian Church v. Bhd. Mut. Ins. Co.*, 126 F. App'x 235, 242 (6th Cir. 2005) (unpublished opinion) (suggesting that sexual acts liability coverage may apply where individual is accused of *quid pro quo* sexual harassment, but declining to find coverage due to applicable exclusions); *cf. Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 762 (1998) (in vicarious liability context, observing that when individual's reaction to supervisor's unwelcome sexual conduct is basis for tangible employment action, supervisor is acting within scope of employment because "[t]angible employment actions are the means by which the supervisor brings the official power of the enterprise to bear on subordinates"). Indeed, Defendant contends that the Underlying Complaints allege *quid pro quo* sexual harassment claims because he allegedly used his role to condition certain benefits or detriments on sexual favors. (D's Opp. at 9-10; *see* Doc. 82 at 4.) But although Team members perceived Defendant to have the power to take away scholarships and playing time, (K. Doe SAC ¶ 21), the Underlying Complaints do not allege that he took any such action. Nor do they allege that he offered to extend, or threatened to withdraw, benefits from any player based on her consent (or lack of consent) to his conduct. Defendant's alleged conduct is more akin to hostile work environment sexual harassment than *quid pro quo* sexual harassment. Further, the coverage might apply in circumstances more ambiguous than alleged here – for example, a medic or trainer accused of going too far in tending to an injury near a sexually sensitive area.

In sum, Defendant's alleged sexual acts were not within the scope of his employment.[17] As a result, he fails to meet the threshold criteria for the Emotional Injury, Sexual Acts, and Sexual Harassment Coverages as to those alleged acts.

        b.     *Whether Defendant's Alleged Nonsexual Acts Were Within the Scope of His Employment*

There is a possible basis for finding that Defendant's alleged nonsexual acts were within the scope of his employment. Defendant was arguably performing the function of a coach when he set parameters for Team members' conduct in study hall, made travel arrangements for a tournament, and arranged a team outing (albeit one that apparently involved underage drinking). That Mr. Davie approved Defendant's request to use College vans for the outing and observed the team wearing cocktail attire weighs in favor of finding a possible basis that Defendant was acting within the scope of his employment – his boss authorized the trip (although presumably not knowing that Defendant would dance with Team members and direct them to dance with strangers). And the fact that Defendant set harsh parameters on communications with other athletes and parents is not enough of a departure to say there is no possible basis for finding Defendant was acting within the scope of his employment.

But assuming that every alleged nonsexual act was within the scope of Defendant's employment, there is still no coverage that requires Plaintiff to provide Defendant with a defense for such acts. First, Defendant is not entitled to defense coverage for nonsexual acts under the Sexual Acts or Sexual Harassment Coverages because those coverages only cover "event or events" that constitute a "sexual act" or "sexual harassment." (Policy at BMG205.) By definition, the alleged nonsexual acts preclude the application of those coverages.

---

[17] I thus need not reach the issue of whether Defendant acted on the College's behalf or for its benefit, although it seems obvious, for similar reasons, that he did not.

Second, the Emotional Injury Coverage does not cover Defendant because that coverage requires the alleged emotional injury to "arise out of your evaluation, discipline, or graduation practices." (Policy at BMG181 (emphasis omitted).) "Your" means "the person, persons, or organization named as the insured on the declarations," which in this case is "Nyack College & Business Office." (*Id.* at BMG21, 60.) The Policy does not define "evaluation, discipline, or graduation practice," but "[a]s with the construction of contracts generally, unambiguous provisions of an insurance contract must be given their plain and ordinary meaning." *Gilbane Bldg. Co./TDX Constr. Corp. v. St. Paul Fire & Marine Ins. Co.*, 97 N.E.3d 711, 712-13 (N.Y. 2018) (internal quotation marks omitted). "Evaluation" is defined as "the act or result of evaluating," which in turn is defined as, in pertinent part, as "examin[ing] and judg[ing] . . . the worth, quality, significant, amount, degree, or condition of" something. Webster's Third New Int'l Dictionary 786 (1993). "Discipline" is defined as "[p]unishment intended to correct or instruct; . . . a sanction or penalty imposed after an official finding of misconduct." *Discipline*, Black's Law Dictionary (10th ed. 2014); *see* Webster's Third New Int'l Dictionary 644 (1993) (defining discipline as "punishment by one in authority"). "Graduation" is defined as "the act or ceremony of conferring academic diplomas, certificates, or degrees." Webster's Third New Int'l Dictionary 985 (1993). Defendant does not explain how the nonsexual acts were the actions of the College or could be part of an evaluation, discipline, or graduation practice, (D's Opp. at 23), nor do the Underlying Complaints allege that Defendant's nonsexual acts arose out of any such practice of the College.

For these reasons, the Court finds that there is no basis in which Defendant qualifies for a defense under the Emotional Injury Coverage.

2.      Whether Plaintiff Has a Duty to Defend Under the Defense Coverage for Alleged Perpetrators

Defendant argues that the Defense Coverage for Alleged Perpetrators obligates Plaintiff to defend an employee accused of a sexual act so long as he denies his involvement.  (D's Opp. at 18.)  That provision states:  "The commission of a sexual act will not be considered to have occurred within the scope of anyone's delegated authority, but if a person otherwise covered herein denies involvement in the sexual act, then we will provide the alleged perpetrator with the following limited Defense Coverage."  (Policy at BMG207 (emphasis in omitted).)  The Policy does not define "a person otherwise covered herein," and there is no indication whether that phrase is meant to:  1) refer to sorts of persons who can be "covered persons" – "you[,] . . . your leaders, your employees, your appointed persons, and your volunteers"; or 2) include those sorts of persons but only if they were acting on the College's "behalf" and for its "benefit," (*id.* at BMG205) – excusing for those who deny the act only the requirement that they be acting within the scope of their delegated authority.  In other words, there are two clauses to the definition of "covered person" – one requiring the person to be a leader, employee, appointed person, or volunteer, and one requiring the person to be acting on the College's behalf, for the College's benefit, and within the scope of the person's delegated authority, (Policy at BMG205) – and the Defense Coverage for Alleged Perpetrators provision might mean to excuse, for purposes of coverage of defense costs, the entire second clause or only the delegated-authority portion of it.[18]

The former is the better reading.  By conditioning defense coverage on the coverage-seeker's denial, the Defense Coverage for Alleged Perpetrators indicates that the underlying

---

[18] The ambiguity is compounded by the specification that the defense coverage is provided to an "alleged perpetrator[]," (Policy at BMG207), defined as a "covered person accused of committing a sexual act," (*id.* at BMG204 (emphasis omitted)).  Because the commission of a sexual act cannot be within the scope of delegated authority, an "alleged perpetrator" by definition cannot be a "covered person."  Yet the provision clearly contemplates that a defense can be provided to a person accused of committing a sexual act.

allegations should not be credited. It would not make sense to treat certain allegations – such as allegations indicating that the coverage-seeker was not acting on the employer's behalf and for its benefit – as a basis for withholding coverage when the provision is premised on disbelieving the allegations. Alternatively, the provision is ambiguous, in which case the provision "must be construed against the insurer and in favor of the policyholder." *Commercial Union Ins. Co. v. Liberty Mut. Ins. Co.*, 828 N.Y.S.2d 479, 480 (2d Dep't 2007) (quoting *Hartol Prods. Corp. v. Prudential Ins. Co. of Am.*, 47 N.E.2d 687, 690 (N.Y. 1943)).[19]

Indeed, Plaintiff does not dispute that Defendant meets the definition of an alleged perpetrator generally entitled to defense coverage. Rather, Plaintiff argues that this provision does not apply to Defendant because coverage is excluded where the alleged perpetrator has admitted to the sexual act, and Defendant admitted three times to engaging in the acts alleged in the Underlying Complaints. (*See* P's Mem. at 14; P's Reply at 8.) This argument lacks merit.

The first alleged admission is Defendant's email to Davie. (Schlossberg Aff. Ex. C.) Although Defendant apologized and admitted that his actions were "inexcusable" and that "[t]here is no place in athletics for . . . an individual to create an uncomfortable environment," (*id.* at 1), the apology is vague, as Defendant did not specify what he did, nor did he name any Team members. Thus, it cannot be said that this email is an admission to the specific charges in the six Underlying Complaints, and does not relieve Plaintiff of its obligation to provide a defense.

The next alleged admission is Defendant's April 9, 2015 statement to the police. (Schlossberg Aff. Ex. D.) While Defendant stated that "after . . . hearing the statements from the

---

[19] Indeed, Plaintiff does not dispute that Defendant meets the definition of an alleged perpetrator generally entitled to defense coverage. Rather, Plaintiff argues that this provision does not apply to Defendant because coverage is excluded where the alleged perpetrator has admitted to the sexual act, and Defendant admitted three times to engaging in the acts alleged in the Underlying Complaints. (*See* P's Mem. at 14; P's Reply at 8.)

Nyack Softball team, [I] admit that these things did occur," (*id.* at 1), it is unclear whether he reviewed all twelve statements, and if so, whether the six Underlying Plaintiffs were among the twelve deponents. As the insurer, it is Plaintiff's burden to prove an exclusion barring insurance coverage is applicable. *See Seaboard Sur. Co.*, 476 N.E.2d at 275.[20] But by providing the Team members' statements with the victims' names whited-out and not establishing which statements Defendant actually heard, Plaintiff has failed to meet its burden.

Finally, Plaintiff points to Defendant's statements at his sentencing, where he admitted to, among other things, subjecting certain individuals to "unwanted sexual contact for the purpose of degrading and abusing [them] . . . and for the purpose of gratifying [his] own sexual desires." (FAC Ex. A at 10:2-8.) But the Underlying Complaints allege conduct that was not part of the criminal case, and some of the Underlying Plaintiffs were not even victims in the criminal case, so Defendant cannot be said to have admitted to the conduct at issue.

Neither party addresses the significance, if any, of the provision that treats multiple sexual acts as "a single sexual act if [they] are undertaken by the same perpetrator or perpetrators, even if such acts are directed against more than one person, happen over time, or take place during more than one policy period." (Policy at BMG204 (emphasis omitted).) Following the plain meaning of this provision, one instance of one of the five enumerated types of sexual acts, (*see id.* at BMG204), constitutes one sexual act. And if the same alleged perpetrator engaged in additional instances of that or another enumerated sexual act, even against

---

[20] Although the four triggering events that preclude defense coverage are not labeled "exclusions," the court treats the triggering events as exclusions, rather than definitions of coverage, because they narrow the scope of coverage. *Mack-Cali Realty Corp. v. Peerless Ins. Co.*, 115 F. Supp. 3d 449, 453 n.4 (S.D.N.Y. 2015) ("Regardless of whether the provision is a definition or exclusion, it serves the same function: to exclude from coverage liability that arises after a certain point. Therefore, the Court will treat the . . . provision as an exclusion."). Moreover, to the extent the triggering events present an ambiguity, that ambiguity "must be construed against the insurer and in favor of the policyholder." *Commercial Union*, 828 N.Y.S.2d at 480 (quoting *Hartol Prods. Corp.*, 47 N.E.2d at 690).

a different person, those additional instances, combined with the initial instance, constitute one sexual act. This means that each additional instance of an enumerated sexual act by the same alleged perpetrator does not give rise to a new claim for defense coverage because the separate instances constitute one sexual act. Provisions treating multiple acts as a single act work to the benefit of the insurer for purposes of coverage limits. But it is unclear how such a provision should be construed when it is used in a policy provision that excludes coverage where the alleged "has admitted to anyone that he . . . engaged in the sexual act," (*id.* at BMG207 (emphasis omitted)), and where the alleged perpetrator admitted to some acts, but the underlying complaint alleges that he engaged in more acts, (*compare* FAC Ex. A at 8:18-10:14 (at sentencing, Defendant admitting to subjecting certain "members of [the] softball team" to "unwanted sexual contact for the purpose of degrading and abusing [them] . . . and for the purpose of gratifying [his] own sexual desires"), *and* Burke Aff. Ex. 21 (misdemeanor informations in which subjects were three of the Underlying Plaintiffs, alleging that Defendant grabbed or slapped their buttocks and talked graphically about sex in front of them), *with* K. Doe SAC ¶¶ 22- 25 (alleging that Defendant engaged in additional conduct, which included, among other things, requiring Team members to visit home of pornographic actress, "tit punching," licking ears as form of "punishment," forcing Team members to dance with strangers during Alcohol Outing, and shaking a Team member's breasts)). It could mean that the coverage-seeker's admission to any portion of the multi-act sexual act amounts to an admission that he "engaged in the sexual act," or it could mean that he has not admitted to "the sexual act" unless he admitted to the entirety of the conduct.

Plaintiff has not argued that the first interpretation should apply or otherwise suggested that the provision treating multiple sexual acts by one perpetrator as a single sexual act should

result in the denial of defense coverage. Furthermore, the meaning of that provision in the context of the Defense Coverage for Alleged Perpetrators is ambiguous, and that ambiguity "must be construed against the insurer and in favor of the policyholder." *Commercial Union*, 828 N.Y.S.2d at 480 (quoting *Hartol Prods. Corp.*, 47 N.E.2d at 690). Thus, the Court will not treat Defendant's admission to engaging in some of the conduct alleged in the Underlying Complaints as triggering the exclusion in the Defense Coverage for Alleged Perpetrators.

While the three statements to which Plaintiff points will be powerful evidence against Defendant in the underlying cases, the current record does not contain sufficient detail to conclude that Defendant admitted to the conduct alleged in the Underlying Complaints. Plaintiff has thus failed to show that it has no duty to defend Defendant for sexual acts. And because the insurer is obligated to defend the case in full if it is obligated to defend any claim in the Underlying Complaints, Plaintiff is not entitled to summary judgment regarding its duty to defend.

On the other hand, Defendant is not entitled to summary judgment because he has not shown on undisputed facts that he is entitled to coverage. Defendant purportedly admitted, after he heard "statements from the Nyack Softball team," that the things described did occur. (Schlossberg Aff. Ex. D at 1.) Taken together, the statements from the twelve Team members describe conduct substantially similar to the conduct alleged in the Underlying Complaints: inappropriate contact (*e.g.*, smacking buttocks, touching breasts, kissing, and licking); talking graphically about sex; directing a Team member to dance with a random man during the Alcohol Outing and then dancing with her; asking a Team member if she considered a career as a stripper; inviting a pornographic actress to speak to the team; and shaking a Team member's breasts and proclaiming, "This is what top tits looks like." (Schlossberg Reply Aff. Ex. B at 50;

*see id.* at 33, 35, 37, 39, 41, 45-46, 48, 52, 54, 56, 58.)  Certain details alleged in the Underlying Complaints are not included in the Team members' statements (*e.g.*, none of the statements to the police allege that Defendant explained why pornographic films are shot in the early morning).  But if Defendant heard all of the statements and the six Underlying Plaintiffs were among the twelve deponents – and he has not shown that this is not the case – then Defendant would have admitted to essentially the same conduct set forth in the Underlying Complaints.

In sum, material issues of fact exist as to:  (1) the identity of the twelve Team members that gave statements to the police; and (2) which statements Defendant heard before he admitted to the conduct alleged in the statements.  As a result, because Defendant has not shown that he did not admit to the sexual acts, Defendant is not entitled to summary judgment on his claim that Plaintiff owes him defense coverage in the Underlying Actions.

The Court denies both motions for summary judgment as to the duty-to-defend issue because the current record lacks undisputed facts that preclude or mandate application of an exclusion to the Defense Coverage for Alleged Perpetrators.  *See Great Am. Ins. Co. of N.Y. v. Castleton Commodities Int'l LLC*, No. 15-CV-3976, 2016 WL 828127, at *3 (S.D.N.Y. Feb. 25, 2016) (denying cross motions for summary judgment because court could not "conclude at the summary judgment stage that there are undisputed facts that either preclude or mandate [an] exclusion's application"); *Jack P. Fermery & Assocs. Architects, P.C. v. N. River Ins. Co.*, 622 N.Y.S.2d 64, 65 (2d Dep't 1995) (reversing grant of summary judgment in favor of insured where fact issues remained, including whether exclusion applies).

### B.    Duty to Indemnify

Generally, "[c]laims concerning indemnification obligations . . . are not ripe for adjudication until liability has been imposed upon the party to be indemnified."  *FSP, Inc. v.*

*Societe Generale*, No. 02-CV-4786, 2003 WL 124515, at *4 (S.D.N.Y. Jan. 14, 2003) (collecting cases), *aff'd and remanded*, 350 F.3d 27 (2d Cir. 2003), *and adhered to on reconsideration*, 2005 WL 475986 (S.D.N.Y. Feb. 28, 2005); *see U.S. Underwriters Ins. Co. v. Orion Plumbing & Heating Corp.*, No. 16-CV-4641, 2018 WL 2078115, at *4 (E.D.N.Y. Mar. 1, 2018) (collecting cases).  Although the Court does not see how Plaintiff will have any obligation to indemnify Defendant should he be found liable, no liability has been assessed against Defendant, and therefore any claim regarding indemnification is not ripe for adjudication.  Accordingly, Plaintiff's motion is denied to the extent that it seeks a declaration that it has no duty to indemnify Defendant.

### C.     Attorneys' Fees

Defendant seeks attorneys' fees for the costs of litigating this action.  (Doc. 73 at 2-3.) Plaintiff argues that Defendant is not entitled to attorneys' fees because (1) Plaintiff is not insured under the Policy; (2) there has been no bad faith denial of coverage; and (3) Plaintiff has provided gratuitous defense coverage for years.  (Doc. 71 at 2.)

Under New York law, "an insurer's duty to defend an insured extends to the defense of any action arising out of the occurrence, including a defense against an insurer's declaratory judgment action."  *U.S. Underwriters Ins. Co. v. City Club Hotel, LLC*, 822 N.E.2d 777, 780 (N.Y. 2004).  This means that "an insured who is cast in a defensive posture by the legal steps an insurer takes in an effort to free itself from its policy obligations, and who prevails on the merits, may recover attorneys' fees incurred in defending against the insurer's action."  *Id.* (internal quotation marks omitted).

While Defendant is "cast in a defensive posture by" Plaintiff's effort to free itself from it defense-coverage obligation, Defendant has not prevailed on the merits, as the issue of whether

Defendant admitted to the sexual acts alleged in the Underlying Actions has yet to be resolved. As a result, Defendant's request for attorneys' fees is denied. *See Scottsdale Ins. Co. v. United Indus. & Const. Corp.*, 137 F. Supp. 3d 167, 182 (E.D.N.Y. 2015) (dismissing insured's request for attorneys' fees as premature because issues remained for trial).

## IV. <u>CONCLUSION</u>

For the reasons stated above, Plaintiff's Motion for Summary Judgment is DENIED and Defendant's Cross-Motion for Summary Judgment is DENIED. The Clerk of Court is respectfully directed to terminate the pending motions. (Docs. 64, 67.) The parties are to appear before the Court on September 26, 2018 at 10:00 a.m. for a status conference.

**SO ORDERED.**

Dated: September 4, 2018
      White Plains, New York

                                  _____
                                    CATHY SEIBEL, U.S.D.J.